# THE MARYLAND TRANSPORTATION COMPANY, ET AL. *v.* PUBLIC SERVICE COMMISSION OF MARYLAND, ET AL.

[No. 177, September Term, 1967 and No. 126, September Term, 1968.]

*Decided May 28, 1969.*

*Motion for rehearing filed June 27, 1969; denied July 7, 1969.*

The causes were argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, and SINGLEY, JJ.

*William B. Dulany* and *James J. Doherty,* with whom were

*E. Stuart Bushong, Goodloe E. Byron* and *Spencer T. Money* on the brief in No. 177, for appellants.

*Charles R. Richey, General Counsel,* and *Charles J. Stinchcomb,* with whom were *Charles McD. Gillan, Jr., Joseph M. Wyatt, Daniel B. Leonard, William J. Little* and *Benjamin B. Rosenstock* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

This case, which here comes to an end in the spring of 1969, had its beginning in November 1962 when Elkton Trucking Company, Inc., an interstate motor carrier serving Maryland communities, applied to the Public Service Commission of Maryland for the right of intrastate carriage along its interstate routes. By May 1964 fourteen other applications had been filed by various similar interstate motor carriers. After receiving and considering over an extended period extensive testimony, oral and written, from a myriad of witnesses, the Commission on February 18, 1966, issued its opinion and order, finding that "after giving due consideration to all of the relevant evidence * * * public welfare and convenience requires the issuance of permits for the intrastate common carriage of freight as specified in each of the applications * * * as amended in these proceedings" to nine of the fifteen applicants.

The Commission's opinion in part said:

"The State of Maryland is strategically located in an area of substantial population, commercial and industrial concentration. Industry and commerce has vastly expanded within the metropolitan area of Baltimore City, the Maryland portion of the Washington Metropolitan area, and in many other areas of the State and very active efforts are being made to attract new industries to locate in the State.

"Several general witnesses testified in these proceedings on behalf of all applicants. Among them was Harrison Weymouth, Jr., Executive Director of the Economic Development Committee of Prince George's County. This witness testified to the industrial and

commercial growth of this county. He included a list of larger industries which have located major facilities in Prince George's County since 1955. It was his prediction that there will be substantial increases of industrial and commercial development in Prince George's County for the foreseeable future.

"S. W. Parrish, Acting Director, Department of Information and Economic Development for Montgomery County, Maryland, gave figures which showed that the population for Montgomery County in 1930 was 49,206, in 1960 it was 340,928 and that by 1980 the population would be 643,350 based on projections of a County Agency. He also submitted a list of industrial and manufacturing firms located in Montgomery County.

"Benjamin G. Atwood, Manager Area Development Department, The Potomac Edison Company, presented a comprehensive development plant study of an area of 980 square miles which generally encompasses The Potomac Edison System's Frederick Operating District. Among other matters, the study showed the 1960 population of the area to be 99,370. In 1980 the population is estimated to be 163,300 and in 2000 the estimate is 335,000.

"Sidney Hatkin, Economist, Maryland Department of Economic Development, presented a study showing the new and expanded industries by Economic Districts of Maryland. This study showed in 1962 that 20 new industries were added to the Baltimore Metropolitan Area and 54 other industries expanded. In 1963, 26 new industries were added and 42 expanded. In the first 9 months of 1964, 38 new industries were added and 39 expanded. For Maryland as a whole, 166 new industries were added during the 2 year, 9 month period and 184 industries expanded."

The opinion went on to summarize in detail the testimony of some 40 witnesses for the applicants who together showed the inadequacy or slowness of present intrastate service and the

need for additional such service even in cases where existing intrastate carriers had performed reasonably well. These witnesses gave testimony that permitted the Commission to find that the recent and prospective population, economic, business and manufacturing growth in Maryland generated and would generate a need in the public welfare and convenience for added intrastate service on all routes for which an intrastate permit had been sought.

The Commission's opinion went on to say:

"The basic issue in these proceedings is one which has never before been decided by the Commission. Basically, the two questions which the Commission must determine are as follows: (1) Have the present existing intrastate carriers provided satisfactory service between the growing metropolitan areas of the State? (2) If they have not, should the present carriers be permitted to retain their monopolistic intrastate rights or should additional rights be granted to other carriers in order to improve the service offered to intrastate customers by competitive service? The Commission has no difficulty in finding that the service as offered by the existing intrastate carriers has not been adequate. We find extremely significant the testimony of Joseph C. Bianco, President and General Manager of Central Maryland Lines, Inc. He testified that for the six year period 1958 to 1963, the combined increase in business for seven of the present intrastate carriers * * * was about 8%.

"During the same period the economic growth in Maryland has been at a much higher level and apparently because, of either private carriage, or illegal freight movements, the present carriers did not increase their business at a rate even remotely approximating the economic growth of the State. In some instances the use of either private carriage or illegal carriers can be attributed to dissatisfaction with the service provided by the present intrastate carriers.

"The Commission believes that there is a great de-

mand for additional service to be supplied by the motor transport carriers within the State of Maryland and that the State of Maryland has in effect been losing substantial tax revenues and the businesses in Maryland have been receiving inferior services because the present intrastate carriers have failed to actively pursue the business which exists in the State. We believe that the granting of additional permits for intrastate carriage of goods will not materially diminish the business available to the existing intrastate carriers and if anything, the additional competition should re-sult in additional business for them, since many of the shipments now transported by private carriers would be available to both intrastate and interstate shippers if the service is improved. Based on the testimony of witnesses before us, it is obvious that the Commission has every right to expect a continuing commercial and industrial growth in the metropolitan areas of the State and it is our responsibility to see that this growth is not hampered by the lack of adequate intrastate carriage of goods.

"The Commission is keenly aware of the needs of the existing intrastate carriers and intends to continue to examine the results of the effect of the issuance of any additional permits in this case upon the ability of the existing intrastate carriers to survive."

After a rehearing had been denied and a stay granted pending court review, six appeals were taken to various courts and later were consolidated for trial in the Circuit Court for Frederick County. On December 22, 1966, that court upheld the Commission's action in granting the intrastate permits to nine of the applicants. Judge Clapp filed a thorough and sound opinion, which we adopt as the opinion of this Court, on those aspects of the case with which it deals, in the following pertinent parts:

"The cases had their inception before the Commis-sion in an application filed by Elkton Trucking Co., an interstate carrier through Maryland, for permits to

operate as a common carrier by motor vehicles over certain specified Maryland intrastate routes. Fourteen similar applications by other carriers soon followed. Each of these fifteen applicants, by various amendments and stipulations before the Commission, limited its original application to those routes in Maryland over which they had interstate authority from the Interstate Commerce Commission.

"Protests against these applications were promptly filed by the appellants and others not parties to these appeals, all of the protestants being motor carriers operating in intrastate commerce under permits previously issued by the Commission and each of whom would be in competition for such intrastate commerce with one or more of the appellees if their applications were granted. * * *

"The stated objections of the appellants were that there was no need for additional intrastate motor carrier service over the routes requested, that the existing services were more than adequate to the shipping public and that competition for intrastate business by the large interstate carriers would divert and dilute the available freight to an extent that would seriously jeopardize their ability to continue their intrastate operations and might even force some of them out of business altogether. They argued, therefore, that public welfare and convenience did not and would not require the grant of any of the applications.

"The initial application by Elkton was filed on November 16, 1962, and the taking of testimony and the filing of additional documents and affidavits, creating a voluminous record, continued until the Opinion and Order of the Commission on February 18, 1966.

"Thereafter, and in view of the grant of intrastate authority to the nine appellees, the six appellants filed a petition for a rehearing before the Commission alleging in substance that the record before it was stale and should be supplemented. * * *

"It was further contended in the petition for rehear-

ing that the Commission had considered evidence of future economic growth in certain portions of Maryland where intrastate authority was sought and that this came as a surprise to the protestants. Following argument, the Commission, by Order dated May 25, 1966, refused to reopen the matter.

"These appeals from both Orders were duly perfected and the Commission subsequently stayed its grants of intrastate authority pending court review. By agreement of all counsel the appeals were consolidated and forwarded to this Court for hearing and disposition.

"The scope of judicial review of orders of the Public Service Commission is specified in § 97 of Art. 78 of the Annotated Code of Maryland (1957 Ed.), as follows:

'Every * * * order * * * of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be,
(1) in violation of constitutional provisions, or,
(2) not within the statutory authority or jurisdiction of the Commission, or,
(3) made upon unlawful procedure, or,
(4) arbitrary or capricious, or,
(5) affected by other error of law, or,
(6) * * * is unsupported by substantial evidence on the record considered as a whole.'

"The Order of the Commission must be affirmed on appeal unless one or more of the above grounds is clearly shown to exist. *Clark v. Public Service Commission,* 209 Md. 121.

"In these appeals, counsel for the appellants, in answer to a question from the bench, stated that he relied upon all of these grounds but further questioning showed that his entire argument was based upon a charge that there was no substantial evidence in the record to sustain the orders of the Commission and, therefore, its action was arbitrary and capricious. He

then reasoned that this brought into existence all of the other statutory grounds for reversal.

"The standards for issuance of permits by the Commission to motor carriers such as those here involved are set forth in § 33a of Art. 78 as follows:

'Public welfare and convenience—No motor carrier permit shall be issued unless the Commission, after considering the number of vehicles to be used, the rate to be charged, potential demand, qualifications of the applicant and such other factors as it deems relevant, deems that the issuance of a permit will be best for the public welfare and convenience.'

"In view of these statutory provisions, this Court must determine whether there is substantial evidence in the record as a whole to sustain the finding of the Commission that the issuance of the permits would be best for the public welfare and convenience. A corollary to this is a determination whether there is substantial evidence to show that the Commission in making its findings considered proposed rates, potential demand, qualifications of the applicants and other factors deemed relevant. Examination of the complete record together with the opinion of the Commission, discloses that full consideration was given to the specific statutory elements. However, applicants maintain that the general testimony before the Commission as to the economic growth of Maryland in the past and, in particular of the geographic areas served by the parties to this appeal, is an insufficient basis for a finding of potential demand and that introduction of such evidence was something new, first inserted by the Commission into this case. Certainly, as a matter of logic, evidence of past, present and prospective economic growth is highly relevant to a consideration of potential demand for motor carrier service. Moreover, its use by the Commission is not new. For instance, in *Bosley v. Quigley,* 189 Md. 493, *cert. denied,* 334 U. S. 828, an applicant introduced evidence of increased population and industry purporting to show a material

change in transportation requirements along the Washington-Baltimore Boulevard. It is true that in that case the Commission refused the application but, necessarily, it considered this economic evidence.

"It should be noted, also, in connection with this evidence that when the appellants petitioned for a reopening of the case, they claimed that they 'were surprised' by its introduction and should be given an opportunity to rebut it. The record discloses that the appellants had full knowledge of the presence of such evidence in the record for a long period of time prior to the decision of the Commission on the merits but made no effort during that period of time to rebut it in any way.

"One of the basic contentions of the appellants is that there was no evidence before the Commission of the inadequacy of existing intrastate service as to each and every intrastate route applied for and this is apparently true. In the posture of the cases before the Commission involving detailed routes throughout the State, some may have been missed as a matter of detailed evidence. But even as to such routes, there was ample evidence before the Commission to sustain a finding that the present intrastate carriers had little interest in less than truckload shipments in connection with routes served by them. There was, also, ample evidence to show that the interstate carriers, traversing their interstate routes frequently, could give better intrastate service in picking up these small shipments promptly and that shippers not only desired but needed such service in order to meet their out-of-state competition. For instance, some shippers testified that there was faster delivery from their out-of-state competitors to points in Maryland even though the distance from their Maryland plants or warehouses to Maryland customers was shorter.

"From this the Commission was amply justified in finding that the public welfare and convenience of Maryland shippers, present and in the future, would

be better served by granting these permits, thus making available to Maryland shippers a more frequent service for these less than carload lots. At the very least, the record fails to disclose that the Commission was clearly wrong in reaching this determination.

"A second principal thrust of the arguments of the appellants is that the granting of these permits will authorize the large interstate carriers to skim off the cream of the intrastate business and thus will materially impair the ability of the small intrastate carriers to compete or even remain in business. It is claimed that controlled monopoly has always been the standard in Maryland for intrastate carriage of goods and that the Commission has, without authority, made a change in this policy.

"It is to be noted that there is nothing in the statutes requiring either monopoly or competition between carriers.

"In *Tidewater Express Lines v. Public Service Commission,* 199 Md. 533, the Court of Appeals said at pages 540 and 541,

'If we assume that under section 312 it is the duty of the Commission, in exercising the power to grant or refuse permits, to prevent destructive competition, this duty is at most one of "imperfect obligation," not defined in the statute, but dependent upon the Commission's finding of facts as to the "public welfare and convenience" — or plaintiffs' synonyms for this expression.'

"In *Clark v. Public Service Commission, supra,* the Court of Appeals also dealt with this proposition, stating at page 132,

'It is entirely true that the obligation of the Public Service Commission to protect a common carrier against competition in order to conserve existing investments is secondary to the paramount obligation of the Commission to secure adequate and permanent service for the public at the least possible cost.'

"The above quoted cases together with *Public Ser-*

*vice Commission v. Williams*, 166 Md. 277 and *Public Service Commission v. Williams*, 167 Md. 316 fully illustrate that the existence or non-existence of competition, even competition destructive to existing franchise holders, is a legislative and not a judicial question and the determination of it is primarily for the Public Service Commission.

"It is clear that the Commission was well aware of the fact that it was departing from its previous policy concerning controlled monopoly and that such change might adversely affect existing intrastate carriers. Its opinion states that it is keenly aware of the problem and 'intends to continue to examine the results of the effect of the issuance of any additional permits in this case based upon the ability of the existing intrastate carriers to survive.'

"On the basis of the economic testimony submitted, and the testimony of shippers as to the increasing need for more intrastate facilities, particularly, less than carload lots, it cannot be said that there was no substantial evidence before the Commission to warrant a change in policy from regulated monopoly to regulated competition.

"Turning now to the Order refusing to reopen the case, the Court has indicated previously in this Opinion the propriety of the admission and consideration of economic testimony and will only say further that its introduction and consideration should not have come as a surprise to the appellants in view of the decision in *Bosley v. Quigley, supra.*

"As to the contention of Charlton that the case should have been reopened to consider its acquisition of Hopwood, it need only be said that once the Commission has determined upon a policy of competition rather than regulated monopoly, which the Court has found to be proper, the adequacy of Charlton's service over the former Hopwood routes was not a conclusive factor.

\* \* \*

"Two further matters should be dealt with, the first being the contention by some of the appellants that the routes applied for by the appellees did not in fact duplicate in Maryland their interstate franchises but were, in some instances, an extension of them. It is clear from the amendments of the applications and from the amendments of the applications and from the Opinion of the Commission, that permits would be granted only for such duplicate routes. This particular issue, therefore, can be dealt with when the detailed permits are drafted and submitted to the Commission for issuance. The second question still to be dealt with arises because the Court was informed on the day of argument that one of the appellees, Service Trucking Co., Inc., had been adjudicated a bankrupt subsequent to the Orders of the Commission. Here, again, this question can be dealt with by the Commission in connection with its issuance of the detailed permits and nothing in this Opinion is to be construed as preventing the Commission from refusing or granting a permit to the receiver or trustee in bankruptcy of Service Trucking if the Commission disapproves of the qualifications of the applicant or for any other statutory or regulatory reason."

The order of the Circuit Court affirmed the orders of the Commission and remanded the matter for housekeeping review to determine that the permit granted conformed to the existing interstate routes in Maryland of the applicant and to its application, as refiled under the Commission's order. The protestants appealed to this Court.

In March 1967 the Commission held a hearing on the protestants' petition for a stay of the order issuing the permits until the appeal was decided. Following this the applicants and the Commission's transportation expert redrafted all the applications and they were filed with the Commission between March 1 and June 14, 1967. The protestants filed objections, alleging that the applications asked for intrastate rights exceeding the interstate rights, and that the applications sought the intrastate equivalent of the interstate area rights of the applicants (the I.

C. C. grants area rights under which a carrier can operate over any highway in the area and on any schedule it chooses, say the appellants, the Maryland law, Code (1965 Repl. Vol.), Art. 78, § 32 (a-1), requires that a carrier operate between fixed termini and on regular schedules.)

The Commission did not concede that it could not grant area rights under § 32 (a-1) of Art. 78 but, since it did not need to do so in the cases before it to accomplish the purposes it had in mind, concluded that it would meet the objections of the protestants and ordered that all applications again be refiled, this time in the customary form designating routes and termini.

This was done and once more the protestants objected. This time they said the Commission could not grant intrastate regular route authority to an applicant because such authority would not be the same as that carrier's interstate irregular route or "area" authority (having argued before that the Commission could not grant intrastate area rights).

The obvious answer which the Commission in essence gave was that as to intrastate rights in Maryland it was not bound by the extent of the applicant's interstate authority and that its original intent in granting intrastate rights was to permit an interstate carrier to do intrastate carriage in the course of the operation of its interstate business in Maryland, and if it granted specified rates between fixed termini in the area covered by the interstate rights which permitted carriage between points that the interstate area rights did not permit, that was within its authority to do and legally permissible.

An appeal was taken from the Commission's order of December 6, 1967, approving the applications filed for the third time (most of which were identical with those originally filed in the form such applications traditionally have been filed) and directing that the permits be issued on December 16, 1967. Judge Clapp affirmed the Commission on April 22, 1968. The protestants appealed and the appeal was consolidated with that from the 1966 order of Judge Clapp and argued and considered as one. As we do in the 1966 appeal, we affirm Judge Clapp's order in the 1968 appeal.

*Orders affirmed, with costs.*